UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
R. ALEXANDER ACOSTA,
U.S. SECRETARY OF LABOR,

                      Plaintiff,

                v.

WILMINGTON TRUST, N.A. f/k/a
WILMINGTON TRUST RETIREMENT
AND INSTITUTIONAL SERVICES; AND
THE HCMC LEGAL, INC. EMPLOYEE
STOCK OWNERSHIP PLAN,

                      Defendants.
------------------------------------------------------X

**MEMORANDUM AND ORDER**

17-CV-6325 (VSB) (KNF)

KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE

       This is an action against Wilmington Trust, N.A. ("Wilmington"), the trustee for the HCMC Legal, Inc. Employee Stock Ownership Plan ("ESOP"), for damages and injunctive relief under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. The plaintiff alleges that Wilmington failed to investigate the value of HCMC Legal, Inc.'s ("HCMC") stock, relied improperly on an inflated valuation of HCMC's stock value in approving ESOP's purchase of 100% of HCMC's stock and breached its fiduciary duty to the ESOP's participants and beneficiaries.

       Before the Court is the plaintiff's motion for an order, pursuant to Rule 37(a) of the Federal Rules of Civil Procedure, to compel: (1) "Daroth Capital Advisors, LLC ['Daroth'] to produce fifty documents specified by the Secretary and identified on Daroth's privilege log; and (2) Peter Rothschild ['Rothschild'] to respond to deposition questions that he was instructed not to answer, and testify with respect to documents that were improperly withheld on claims of

1

privilege." Daroth, Rothschild, HCMC and Lynn Mestel ("Mestel"), the president and Chief Executive Officer of HCMC's predecessor companies, oppose the motion.

## PLAINTIFF'S CONTENTIONS

The plaintiff asserts that ESOP purchased HCMC's stock from its founder Mestel and her daughter Willa Fawer ("Fawer"), an HCMC executive. Prior to the ESOP transaction, HCMC retained Daroth as its "financial advisor with respect to a possible Sale" of the company. As HCMC's financial advisor, Daroth agreed to perform "financial advisory services" that included studying and evaluating HCMC's business prospects, analyzing HCMC's financial alternatives, identifying potential investors, analyzing any offers received and negotiating agreements with prospective investors. Daroth's engagement agreement with HCMC provided that Daroth was "retained under [the engagement] agreement as an independent contractor with no fiduciary or agency relationship to [HCMC] or to any other party." HCMC engaged Greenberg Traurig, LLP ("GT") as its legal counsel in connection with the ESOP transaction, while Daroth opted not to retain counsel. Daroth's President and CEO, Rothschild, testified at his deposition that Daroth does not retain counsel for "middle mark transactions," such as HCMC's ESOP transaction and Daroth did not pay GT any attorney's fees. The plaintiff asserts that Daroth did not produce a retention agreement with GT or any other documents evidencing that Daroth engaged GT. Nonetheless, Daroth withheld 274 subpoenaed documents, 50 of which are challenged by the instant motion, claiming they implicate legal advice to Daroth provided by or solicited from GT. Moreover, during his deposition, Rothschild was instructed not to respond to questions on the basis of the attorney-client privilege.

The plaintiff contends that Daroth has no attorney-client relationship with GT and the attorney-client privilege does not apply to Daroth. The disputed 50 communications were not

intended to be and were not confidential communications between an attorney and a client because: (a) "only 25 involved communications that included the attorney [GT] and the client (HCMC/Mestel/Fawer), and all of those communications also included Daroth"; (b) "12 of the documents were communications solely between or among Daroth representatives"; (c) "6 were communications between Daroth and [GT] (with no client)"; and (d) "7 were communications between HCMC/Mestel/Fawer and Daroth (with no lawyer)." Mestel and HCMC did not intend their communications to be confidential because they included Daroth in them and, in a significant number of communications between HCMC and GT that HCMC intended to keep confidential, Daroth was not included. The plaintiff asserts that Mestel demonstrated her awareness of the confidential nature of her communications with GT when she excluded Daroth from her communications with GT and Fawer.

According to the plaintiff, the information sought contains unprotected business advice by Daroth, which was engaged as a financial adviser to HCMC. For example, "Daroth has withheld a list of concerns raised by Wilmington Trust's counsel and financial advisor—and sent to Daroth—regarding the financial fairness of the proposed transaction, based upon 'Financial Issues . . . revealed by Chartwell's financial analysis of the transaction . . . .'" The financial nature of the "Financial List" is confirmed by the fact that, within 30 minutes of its receipt, Mestel forwarded it to her financial adviser for feedback, not to her attorney at GT. Rohtschild responded with his comments on the "Financial List" that were "almost necessarily financial advice." The plaintiff contends that Daroth's presence on e-mail communications at issue, even if they were privileged, waived the privilege because: (i) Daroth was not an interpreter between HCMC and GT; and (ii) the "functional equivalent" doctrine, not recognized in this circuit, does

3

not apply because Daroth was not a "de facto employee" of HCMC with primary responsibility for a key corporate job that possessed exclusive information.

The plaintiff contends that Rohtschild was instructed not to answer questions that: (a) attempted to establish and test the factual predicate for the privilege assertion; and (b) regarded his own understanding of certain communications. However, none of the questions Rothschild was instructed not to answer implicated attorney-client privilege.

## RESPONDENTS' CONTENTIONS

The respondents contend that "Mestel did not believe that the scope of [Daroth's] representation was restricted by the engagement letter," and Daroth "functioned as if it were an in-house corporate financial and mergers and acquisitions department as well as a CFO." According to the respondents, the transaction at issue "was financially and legally complex because it involved many different steps, financial instruments, and parties" and "Daroth's expertise was also necessary to assist GT with providing legal advice on a variety of complex financial matters outside both GT and HCMC's expertise." Thus, "Mestel established a relationship between Daroth and GT wherein Daroth would provide its thoughts and observations about the transactions in order to inform GT and seek GT's legal advice." Mestel "believed that her conversations with GT, with Daroth present, were privileged and confidential."

The respondents contend that the plaintiff failed to show the relevance of the communications at issue, since "Daroth and HCMC's communications reflecting its internal deliberations on the transaction cannot be relevant to Wilmington's liability." The respondents maintain that the documents at issue are privileged because "Daroth, a key advisor to both HCMC and GT, was in the circle of confidence and privilege," and the parties intended to and

4

kept "the relevant communications confidential." Furthermore, "emails from Daroth, HCMC, and GT, all explicitly states [sic] that they contain or may contain privileged and/or confidential material."

The respondents contend that "there is no cause to destroy privilege when Daroth communicates directly with GT, without HCMC present, because Daroth was permitted to do so as HCMC and GT's necessary agent," and the plaintiff's "observation that HCMC or GT did not intend to include Daroth on certain communications . . . has no bearing whatsoever on the need for Daroth on the remaining communications." The communications at issue constituted legal, not business advice as "[b]oth HCMC and Daroth were relying on GT to provide legal advice as to how to implement a structure, as a matter of, among other things, contract, corporate, securities, corporate governance, and ERISA law." Since "Daroth acted as HCMC's agent in navigating the transaction," its presence on communications did not destroy the privilege. Given that Rothschild and Mestel gave Daroth "substantial latitude to negotiate the transaction and execute HCMC's goals," "[i]t is these realities [that] dictate the privileged nature of their relationship, not," as the plaintiff argues, "the boiler-plate label in a retention letter, which both Ms. Mestel and Mr. Rothschild have disclaimed as an indicator of the realities of the parties' relationship." Moreover, because Daroth acted as GT's agent, "the input from Daroth was necessary for GT to be able to provide full and effective legal advice to HCMC concerning the transaction." The respondent asserts that no grounds exist to revisit Rothschild's deposition since he was instructed properly not to answer certain questions based on the attorney-client privilege.

5

## PLAINTIFF'S REPLY

The plaintiff contends:

> If HCMC and Mestel can assert privilege over communications sent to or received by Daroth—a third-party investment bank that provided HCMC with standard-fare investment banking services of the kind it provided to a number of other clients at the time—simply because Daroth provided a service that HCMC could not perform itself or offered advice that HCMC and its attorneys found helpful, then the privilege would extend to communications with any service provider.

The plaintiff maintains that the withheld documents are relevant even if Wilmington did not send or receive them because the issues in this case "consist of a complicated stock-purchase transaction and the extent to which Wilmington understood, negotiated, and accounted for its key components on the ESOP's behalf." Moreover, the documents at issue likely concern business and not legal advice, and Daroth was not the functional equivalent of HCMC as no evidence exists that Daroth was HCMC's "de facto in house corporate finance and M&A department." The plain terms of Daroth's engagement letter make clear that "Daroth has been retained . . . . as an independent contractor with no fiduciary or agency relationship to the Company or to any other party," and the respondents' characterization of this language as "boilerplate" is meritless; the respondents "have no trouble relying on boiler plate when it supports their claims of privilege," such as "the automatic confidentiality disclaimer appended to emails sent by [GT], HCMC and Daroth—perhaps the quintessence of boiler plate." Furthermore, Daroth was not an indispensable translator for Mestel or GT, in light of the record that "is replete with evidence of Ms. Mestel's sophisticated financial acumen, involvement in the transaction's most technical financial details, and willingness to challenge Daroth even in areas of its supposed expertise, belying the notion that Daroth was 'indispensable' in order for Mestel to communicate with her attorney." Even assuming that "Mestel needed Daroth to help her understand some of the *financial* implications of the transaction, the same cannot be true of its *legal* implications"

6

because Daroth "is an investment bank and its principal, Rothschild, is not a lawyer." For example, "in one instance where Daroth veered out of its financial lane, Mestel was quick to reprimand: 'Also-isn't GT suppose[d] to handle the legal documents and you Daroth handle the financial questions?'"

## LEGAL STANDARD

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.
>
> Fed. R. Civ. P. 26(b)(1).
>
> When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial preparation material, the party must: (1) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.
>
> Fed. R. Civ. P. 26(b)(5)(A).

In an action, such as this one, brought under federal law, "[t]he common law—as interpreted by United States courts in the light of reason and experience—governs a claim of privilege," unless the United States Constitution, a federal statute or rules prescribed by the Supreme Court provide otherwise. Fed. R. Evid. 501. "A party seeking discovery may move for an order compelling an answer, designation, production, or inspection. This motion may be made if . . . a deponent fails to answer a question asked under Rule 30 or 31 . . . or a party fails to produce documents." Fed. R. Civ. P. 37(a)(3)(B). Motions to compel, pursuant to Fed. R. Civ. P. 37, are left "to the sound discretion of the district court." United States v. Sanders, 211 F.3d 711, 720 (2d Cir. 2000).

7

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal assistance." Brennan Ctr. For Justice v. Dep't of Justice, 697 F.3d 184, 207 (2d Cir. 2012) (quoting United States v. Mejia, 655 F.3d 126, 132 (2d Cir. 2011)).

> The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney: "[T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."
> 
> Upjohn Co. v. United States, 449 U.S. 383, 395-96, 101 S. Ct. 677, 685-86 (1981) (citation omitted).
> 
> Under certain circumstances, however, the privilege for communication with attorneys can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client. . . . "Hence the presence of an accountant . . . while the client is relating a complicated tax story to the lawyer, ought not destroy the privilege . . . ." "What is vital to the privilege is that the communication be made *in confidence* for the purpose of obtaining *legal* advice *from the lawyer*. If what is sought is not legal advice but only accounting service . . . or if the advice sought is the accountant's rather than the lawyer's, no privilege exists." . . . The party claiming the benefit of the attorney-client privilege has the burden of establishing all the essential elements.
> 
> United States v. Adlman, 68 F.3d 1495, 1499-1500 (2d Cir. 1995).

"Fundamentally, legal advice involves the interpretation and application of legal principles to guide future conduct or to assess past conduct. It requires a lawyer to rely on legal education and experience to inform judgment." In re County of Erie, 473 F.3d 413, 419 (2d Cir. 2007) (internal citation omitted). A determination respecting whether material at issue is privileged is a matter within the court's discretion. See Adlman, 68 F.3d at 1499.

8

"A party that shares otherwise privileged communications with an outsider is deemed to waive the privilege by disabling itself from claiming that the communications were intended to be confidential. Moreover, the purpose of the communications must be solely for the obtaining or providing of legal advice." Schaeffler v. United States, 806 F.3d 34, 40 (2d Cir. 2015). "[T]he privilege is triggered only by a client's request for legal, as contrasted with business, advice." In re Grand Jury Subpoena Duces Tecum, 731 F.2d 1032, 1037 (2d Cir. 1984).

## APPLICATION OF LEGAL STANDARD

### *Whether Communications Are Between a Client and the Client's Attorney*

The Court rejects the respondents' argument that the e-mail communications at issue are not relevant as frivolous because they are listed on Daroth's privilege log and only relevant matter is subject to discovery. See Fed. R. Civ. P. 26(b)(1). The Court also rejects the respondents' baseless argument that the quintessential example of a boiler-plate disclaimer at the end of the e-mail communications at issue, stating "that they contain or may contain privileged and/or confidential material, are intended for the intended recipient, and ask the sender to delete the email and notify the sender if received in error," shows that "the communications at issue were confidential."

All but one of the 50 e-mail communications at issue, to which Daroth asserts that the attorney-client privilege applies, indicate that Rothschild was their author or recipient. The only exception is what appears to be Daroth's internal e-mail message designated in Daroth's privilege log as "DAROTH_0022487," dated "4/27/2011," from "Adam Rainey <adam@daroth.com>" to "Andrew Bess <andy@daroth.com." Thus, all 50 e-mail communications at issue were sent or received by Daroth.

9

The June 14, 2010 agreement between Daroth and HCMC's predecessors contains term No. 5: "Daroth has been retained under this agreement as an independent contractor with no fiduciary or agency relationship to the Company or to any other party." Term No. 5 is clear and unambiguous, and the respondents do not contend the contrary.

Rothschild stated in his declaration that, despite the engagement letter's clear and unambiguous language that "'Daroth has been retained under this agreement as an independent contractor with no fiduciary or agency relationship to the Company or to any other party,' we do frequently work as our clients' agent in transactions and did so with respect to various aspects of our engagement by HCMC." That Daroth might have acted as HCMC's "agent" is irrelevant to determining whether Daroth was HCMC's agent in a circumstance where the parties' agreement governs their relationship and the notion of agency is contrary to the clear and unambiguous term of the agreement that specifically negates the existence of any agency relationship between Daroth and HCMC. If Daroth acted in a capacity that is specifically negated by an express term of the parties' agreement in effect at the relevant time, as Rothschild appears to assert, it did so at its own peril because the relationship between Daroth and HCMC was governed by the written instrument agreed upon and executed by the parties, making such conduct not only perilous but also unreasonable.

The Court finds Mestel's statements in her declaration: (a) "Daroth's performance did not appear to me to be restricted in any way by Daroth's engagement letter"; and (b) "Daroth functioned as if it were an in-house corporate transactional advisor and a CFO" incredible and self-serving, especially in light of the fact that Mestel signed the agreement on behalf of HCMC, which also provided, inter alia, that: (i) it is governed by New York law; (ii) HCMC "irrevocably consents to personal jurisdiction in the Supreme Court of the State of New York in New York

10

County, Commercial Part, or any Federal court sitting in the Southern District of New York for the purposes of any suit, action or other proceeding arising out of this agreement"; (iii) "any right to trial by jury with respect to any claim or action arising out of this agreement or conduct in connection with this engagement is hereby waived"; and (iv) "[t]his agreement shall be binding upon Daroth and the Company and their respective successors and assigns." What Mestel believed, for example, "I fully believed that I was able to speak freely with Daroth present when obtaining legal advice from [GT]," is not only implausible in light of the agreement between Daroth and HCMC, but also irrelevant given the clear and unambiguous term of the parties' agreement, indicating that Daroth had no fiduciary or agency relationship with HCMC.

The Court finds that Daroth was not HCMC's agent at the relevant time. The evidence in the record is undisputed that Daroth was not GT's client or the client of any other counsel at the pertinent time. Thus, the Court finds that Daroth failed to establish that it had an attorney-client relationship with GT or any other counsel at any time relevant to the instant controversy. Accordingly, no attorney-client privilege applies to the 50 e-mail communications at issue. Even assuming that an attorney-client privilege applies to the e-mail communications at issue, exchanged between HCMC and its attorney, GT, the privilege was waived by including Daroth in those communications. See Schaeffler, 806 F.3d at 40.

As a result of the Court's finding that no attorney-client privilege applies to the 50 e-mail communications at issue, the Court also finds that Rothschild's assertion of the attorney-client privilege, as a basis for not responding to questions at his deposition, was improper. Therefore, Rothschild shall: (a) respond to questions that he was instructed not to answer based on the attorney-client privilege; and (b) testify with respect to the 50 e-mail communications at issue that were withheld, improperly, based on the attorney-client privilege.

11

## CONCLUSION

For the foregoing reasons, the plaintiff's motion to compel, Docket Entry No. 32, is granted. On or before February 5, 2019, Daroth shall produce the 50 e-mail communications at issue. On or before February 15, 2019, Rothschild shall testify as indicated above.

Dated: New York, New York
       February 1, 2019

SO ORDERED:

*Kevin Nathaniel Fox*
KEVIN NATHANIEL FOX
UNITED STATES MAGISTRATE JUDGE