# EXHIBIT 48

# Principles *of* Corporate Finance

TENTH EDITION

**Richard A. Brealey**
*Professor of Finance*
*London Business School*

**Stewart C. Myers**
*Robert C. Merton (1970) Professor of Finance*
*Sloan School of Management*
*Massachusetts Institute of Technology*

**Franklin Allen**
*Nippon Life Professor of Finance*
*The Wharton School*
*University of Pennsylvania*

McGraw-Hill Irwin

The McGraw·Hill Companies

McGraw-Hill Irwin

PRINCIPLES OF CORPORATE FINANCE

Published by McGraw-Hill/Irwin, a business unit of The McGraw-Hill Companies, Inc., 1221 Avenue of the Americas, New York, NY, 10020. Copyright © 2011, 2008, 2006, 2003, 2000, 1996, 1991, 1988, 1984, 1980 by The McGraw-Hill Companies, Inc. All rights reserved. No part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written consent of The McGraw-Hill Companies, Inc., including, but not limited to, in any network or other electronic storage or transmission, or broadcast for distance learning.

Some ancillaries, including electronic and print components, may not be available to customers outside the United States.

This book is printed on acid-free paper.

1 2 3 4 5 6 7 8 9 0 DOW/DOW 1 0 9 8 7 6 5 4 3 2 1 0

ISBN 978-0-07-353073-4
MHID 0-07-353073-5

Vice president and editor-in-chief: *Brent Gordon*
Publisher: *Douglas Reiner*
Executive editor: *Michele Janicek*
Director of development: *Ann Torbert*
Senior development editor: *Christina Kouvelis*
Development editor II: *Karen L. Fisher*
Vice president and director of marketing: *Robin J. Zwettler*
Marketing director: *Rhonda Seelinger*
Senior marketing manager: *Melissa S. Caughlin*
Vice president of editing, design, and production: *Sesha Bolisetty*
Managing editor: *Lori Koetters*
Lead production supervisor: *Michael R. McCormick*
Interior and cover design: *Laurie J. Entringer*
Senior media project manager: *Susan Lombardi*
Cover image: *© Jupiter Images Corporation*
Typeface: *10/12 Garamond BE Regular*
Compositor: *Laserwords Private Limited*
Printer: *R. R. Donnelley*

**Library of Congress Cataloging-in-Publication Data**

Brealey, Richard A.
Principles of corporate finance / Richard A. Brealey, Stewart C. Myers, Franklin Allen.—10th ed.
p. cm.—(The McGraw-Hill/Irwin series in finance, insurance, and real estate)
Includes index.
ISBN-13: 978-0-07-353073-4 (alk. paper)
ISBN-10: 0-07-353073-5 (alk. paper)
1. Corporations—Finance. I. Myers, Stewart C. II. Allen, Franklin, 1956-III. Title.
HG4026.B667 2011
658.15—dc22

2009048209

www.mhhe.com

The J.C. Penney interest payment is fixed for the life of the bond, but in some issues the payment varies with the general level of interest rates. For example, the payment may be set at 1% over the U.S. Treasury bill rate or (more commonly) over the **London interbank offered rate (LIBOR),** which is the rate at which international banks lend to one another. Sometimes these *floating-rate notes* specify a minimum (or floor) interest rate or they may specify a maximum (or cap) on the rate.[13] You may also come across "collars," which stipulate both a maximum and a minimum payment.

## 24-3 Security and Seniority

Almost all debt issues by industrial and financial companies are general unsecured obligations. Short-term unsecured issues are usually called **notes;** longer-term issues like the J.C. Penney bond are called **debentures** (though in some countries, such as the U.K. and Australia, "debenture" means a *secured* bond).

Utility company bonds are more often secured. This means that if the company defaults on its debt, the trustee or lender may take possession of the relevant assets. If these are insufficient to satisfy the claim, the remaining debt will have a general claim, alongside any unsecured debt, on the other assets of the firm.

The majority of secured bonds are **mortgage bonds.** These sometimes provide a claim against a specific building, but they are more often secured on all the firm's property.[14] Of course, the value of any mortgage depends on the extent of alternative uses of the property. A custom-built machine for producing buggy whips will not be worth much when the market for buggy whips dries up.

Companies that own securities may use them as collateral for a loan. For example, holding companies are firms whose main assets consist of common stock in a number of subsidiaries. So, when holding companies wish to borrow, they generally use these investments as collateral. The problem for the lender is that the stock is junior to all other claims on the assets of the subsidiaries, and so these *collateral trust bonds* usually include detailed restrictions on the freedom of the subsidiaries to issue debt or preferred stock.

A third form of secured debt is the **equipment trust certificate.** This is most frequently used to finance new railroad rolling stock but may also be used to finance trucks, aircraft, and ships. Under this arrangement a trustee obtains formal ownership of the equipment. The company makes a down payment on the cost of the equipment, and the balance is provided by a package of equipment trust certificates with different maturities that might typically run from 1 to 15 years. Only when all these debts have finally been paid off does the company become the formal owner of the equipment. Bond rating agencies such as Moody's or Standard & Poor's usually rate equipment trust certificates one grade higher than the company's regular debt.

Bonds may be senior claims or they may be subordinated to the senior bonds or to *all* other creditors.[15] If the firm defaults, the senior bonds come first in the pecking order. The subordinated lender gets in line behind the general creditors but ahead of the preferred stockholders and the common stockholders.

---

[13] Instead of issuing a capped floating-rate loan, a company sometimes issues an uncapped loan and at the same time buys a cap from a bank. The bank pays the interest in excess of the specified level.

[14] If a mortgage is *closed,* no more bonds may be issued against the mortgage. However, usually there is no specific limit to the amount of bonds that may be secured (in which case the mortgage is said to be *open*). Many mortgages are secured not only by existing property but also by "after-acquired" property. However, if the company buys only property that is already mortgaged, the bondholder would have only a junior claim on the new property. Therefore, mortgage bonds with after-acquired property clauses also limit the extent to which the company can purchase additional mortgaged property.

[15] If a bond does not specifically state that it is junior, you can assume that it is senior.




**FIGURE 24.1**

Ultimate percentage recovery rates on defaulting debt by seniority and security, 1987–2006.

*Source:* Moody's, "Moody's Ultimate Recovery Database."

As you can see from Figure 24.1, if default does occur, it pays to hold senior secured bonds. On average, investors in these bonds can expect to recover nearly two-thirds of the amount of the loan. At the other extreme, recovery rates for junior unsecured bondholders are only 15% of the face value of the debt.

## Asset-Backed Securities

Instead of borrowing money directly, companies sometimes bundle up a group of assets and then sell the cash flows from these assets. This issue is known as an *asset-backed security*, or *ABS*.

Suppose your company has made a large number of mortgage loans to buyers of homes or commercial real estate. However, you don't want to wait until the loans are paid off; you would like to get your hands on the money now. Here is what you do. You establish a separate company that buys a package of the mortgage loans. To finance this purchase, the company sells *mortgage pass-through certificates*. The holders of these certificates simply receive a share of the mortgage payments. For example, if interest rates fall and the mortgages are repaid early, holders of the pass-through certificates are also repaid early. That is not generally popular with these holders, for they get their money back just when they don't want it—when interest rates are low.

Sometimes, instead of issuing one class of pass-through certificates, the company will issue several different classes of security, known as *collateralized mortgage obligations* or *CMOs*. For example, any mortgage payments might be used first to pay off one class of security holders and only then will other classes start to be repaid. As we will see in Chapter 30, these CMOs ran into heavy weather during the credit crisis of 2007–2009.

Real estate companies are not unique in wanting to turn future cash receipts into up-front cash. Automobile loans, student loans, and credit card receivables are also often bundled and remarketed as an asset-backed security. Indeed, investment bankers seem able to repackage any set of cash flows into a loan. In 1997 David Bowie, the British rock star, established a company that then purchased the royalties from his current albums.