**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| R. ALEXANDER ACOSTA,<br>Secretary of Labor,<br>United States Department of Labor<br><br>       Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST, N.A., f/k/a<br>WILMINGTON TRUST RETIREMENT AND<br>INSTITUTIONAL SERVICES; and THE HCMC<br>LEGAL, INC. EMPLOYEE STOCK<br>OWNERSHIP PLAN,<br><br>      Defendants. | Case No. 1:17-cv-6325(VSB) |

<br>

### WILMINGTON TRUST, N.A.'S
### MEMORANDUM OF LAW IN SUPPORT OF ITS
### <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

**Groom Law Group, Chartered**
Michael J. Prame
Mark C. Nielsen
Andrew Salek-Raham
1701 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 861-0620
Facsimile: (202) 659-4503
Email: mprame@groom.com
      mnielsen@groom.com
      asalek-raham@groom.com

*Counsel for Wilmington Trust, N.A.*

## <u>**TABLE OF CONTENTS**</u>

I.    INTRODUCTION ................................................................................................ 1

II.   BACKGROUND ................................................................................................ 4

   A.  ESOP Transactions Are Leveraged Buyouts. ........................................................ 4

   B.  The Use Of Warrants In Leveraged Transactions. ................................................. 7

   C.  The HCMC ESOP's Leveraged Buyout of HCMC. .............................................. 8

III.  ARGUMENT ................................................................................................... 12

   A.  The Department's Theory Is Contrary To The Controlling Legal Standard. ....................... 12

   B.  The Department's Theory Is Contrary To Its Own Guidance And Congressional Intent .. 17

   C.  The Department's Experts Admitted That Below Market Interest Rates And Warrants Can Offset Each Other. ..................................................................................... 19

IV.   CONCLUSION ................................................................................................ 22

# TABLE OF AUTHORITIES

Cases

*Chesemore v. Alliance Holdings, Inc.*,
   886 F. Supp. 2d 1007 (W.D. Wisc. 2012) ......................................................... 13, 14
*Donovan v. Cunningham*,
   716 F.2d 1455 (5th Cir. 1983) .............................................................. 4, 5, 13
*Estate of Blount v. C.I.R.*,
   87 T.C.M. (CCH) 1303 (2004) ........................................................................ 16
*Eyler v. Comm'r*,
   69 T.C.M. (CCH) 2200 (T.C. 1995), *aff'd* 88 F.3d 445 (7th Cir. 1996) ................................. 13
*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014) ................................................................... 4, 18, 19
*Grindstaff v. Green*,
   133 F.3d 416 (6th Cir. 1998) ......................................................................... 4
*Hans v. Tharaldson*,
   No. 3:05-cv-115, 2011 WL 6937598 (D.N.D. Dec. 23, 2011) ................................. 13
*Henry v. Champlain Enterprises, Inc.*,
   445 F.3d 610 (2d Cir. 2006) ................................................................... 12, 13
*Hugler v. First Bankers Tr. Servs., Inc.*,
   No. 12-CV-8649, 2017 WL 1194692 (S.D.N.Y. Mar. 30, 2017) ............................ 5
*Perez v. Bruister*,
   54 F. Supp. 3d 629 (S.D. Miss. 2014) ......................................................... 13
*Reich v. Valley Nat. Bank of Arizona*,
   837 F. Supp. 1259 (S.D.N.Y. 1993) ........................................................ 5, 14, 16, 17
*Scott v. Evins*,
   802 F. Supp. 411 (N.D. Ala. 1992), *aff'd*, 998 F.2d 1022 (11th Cir. 1993) ...................... 16, 17

Statutes

29 U.S.C. § 1001 ....................................................................................... 1
29 U.S.C. § 1002(18)(B) ................................................................... 1, 13, 14
29 U.S.C. § 1106 ................................................................................... 12
29 U.S.C. § 1108(e) ............................................................................... 12
Pub. L. No. 94-455, § 803(h), 90 Stat. 1520 (1976) ....................................... 4, 18

Regulations

Proposed Regulation Relating to the Definition of Adequate Consideration,
   53 Fed. Reg. 17,632 (May 17, 1988) ........................................................ 13

Other Authorities

136 Cong. Rec. S17793-01 ....................................................................................... 15, 17
News Release, USDL 90-434 (D.O.L.)
   1990 WL 307811 (Aug. 17, 1990) ........................................................................... 15

## I.    <u>INTRODUCTION</u>

Wilmington Trust Company was founded by the du Pont family more than 100 years ago. In 2011, it merged with M&T Bank Corporation, one of the largest U.S. headquartered commercial bank holding companies.  The named defendant, Wilmington Trust, N.A. ("Wilmington Trust"), is a subsidiary of M&T Bank Corporation.

Wilmington Trust operates multiples lines of business, including corporate and institutional services, investment management, and wealth advisory services.  One of the corporate and institutional services that Wilmington Trust provides is trustee services for employee benefit plans that are established by public and private companies nationwide, many of which are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

As relevant here, Wilmington Trust serves as trustee for employee stock ownership plans, otherwise known as "ESOPs."  ESOPs provide a means by which ownership of a company can be tax efficiently transferred from existing shareholders (often the company's founders) to the company's employees, who otherwise could not have independently raised the capital necessary to acquire the business.  In its trustee capacity, Wilmington Trust agrees on behalf of the ESOPs to the purchase price and other terms on which the ESOPs are to acquire the company stock.

In approving stock purchase transactions on behalf of ESOPs, Wilmington Trust qualifies as a "fiduciary" under ERISA.  In that regard, Wilmington Trust has an obligation under ERISA to ensure that the ESOPs do not pay more than "adequate consideration" for the shares of stock acquired by the ESOPs.  As discussed below, "adequate consideration" means "fair market value as determined in good faith by the trustee." 29 U.S.C. § 1002(18)(B).

This lawsuit relates to an August 2011 transaction ("Transaction") in which Wilmington Trust served as the trustee of the HCMC Legal, Inc. ("HCMC") ESOP.  As trustee, Wilmington

Trust engaged Chartwell Capital Solutions ("Chartwell"), a large, well-respected valuation firm with a national footprint, to provide an analysis of the fair market value of HCMC's stock and an opinion that the $46 million purchase price was not more than fair market value.

The United States Department of Labor (the "Department")[1] alleged that Chartwell committed four errors that caused its valuation to overstate the fair market value of HCMC's stock, leading to an alleged $23 million overpayment.  Specifically, this motion is directed at the Department's allegations that Chartwell and Wilmington Trust failed to value warrants that were issued to certain lenders in connection with the Transaction – an alleged error that accounts for approximately 60% of the supposed overpayment.  *See* Complaint ("Compl."), Dkt. 3 at ¶¶ 2, 32, 43-44, 57(d), 60, 73(b), and 74(b).  According to the Department:

> Chartwell knew and advised Wilmington that the warrants that would be issued to the selling shareholders and Long Point in the ESOP Transaction had significant value. But Wilmington failed to ensure that Chartwell incorporated that value into its Valuation Report, and Chartwell's report did not ascribe *any* value to the warrants in determining the fair market value of the ESOP's purchase. Wilmington and Chartwell should have ensured that the valuation valued the warrants properly and reduced the price that the ESOP was willing to pay accordingly. They did not do so.

*Id*. at ¶ 44; *see also id.* at ¶ 73(b) (alleging that Chartwell's valuation had significant flaws and inaccuracies as it "fail[ed] to reduce the value of the HCMC stock the ESOP was to purchase" due to the issuance of the warrants).

For three independent reasons, Wilmington Trust is entitled to summary judgment on the Department's claims based on the warrants.  First, the Department's theory is directly contrary to the controlling legal standard that requires that fair market value be determined under the "hypothetical willing buyer/willing seller" standard, which does not take into consideration how

---

[1]  R. Alexander Acosta, the Secretary of Labor, is the named plaintiff.  Rather than refer herein to the Secretary, we respectfully refer to the lawsuit as having been filed by the agency.

a particular buyer (like the ESOP) may finance its acquisition.  As described below, the warrants issued to the lenders were a component of the acquisition debt for the Transaction and, as the warrants were a component of the financing, Chartwell's fair market value analysis under the hypothetical willing buyer/willing seller standard appropriately did not include a reduction associated with the warrants.

Second, the Department's theory as to the warrants is directly contrary to the position that the Department adopted in 1990 that it (1) "will not consider obligations and liabilities arising in connection with the ESOP's acquisition debt," and (2) "will not consider the obligations assumed by the company in connection with the ESOP in determining whether the plan paid more than adequate consideration for employer securities."  *See infra* Part III.B.  In addition to contravening its prior guidance, the Department's theory is contrary to Congressional intent that the Department refrain from taking action that could serve to "block the establishment and success" of ESOPs.  *Id.*

Third, the Department's experts admitted that below market interest rates on the acquisition debt "create equity value" that can offset the value of warrants.  The undisputed evidence establishes that the interest rate on the acquisition debt in the HCMC ESOP transaction was well below market and that the warrants only brought the rate of return on that debt back up to a market rate. The Department and its experts did not analyze the below market interest rate with respect to which the warrants were issued and, thus, cannot dispute Wilmington Trust's evidence that the value created by the below market interest rate offset the purported loss of value associated with the warrants.  As a result, even if the hypothetical willing buyer/willing seller standard did not apply, no adjustment to Chartwell's calculation of fair market value would be warranted.

## II.   **BACKGROUND**

**A.   ESOP Transactions Are Leveraged Buyouts.**

Following the passage of ERISA in 1974, Congress expressly stated its intent that the

Department refrain from taking steps that would hinder the establishment and success of ESOPs:

> INTENT OF CONGRESS CONCERNING EMPLOYEE STOCK OWNERSHIP PLANS
>
> The Congress, in a series of laws (the Regional Rail Reorganization Act of 1973, the Employee Retirement Income Security Act of 1974, the Trade Act of 1974, and the Tax Reduction Act of 1975) and this Act has made clear its interest in encouraging employee stock ownership plans as a bold and innovative method of strengthening the free provate[sic] enterprise system which will solve th[sic] dual problems of securing capital funds for necessary capital growth and of bringing about stock ownership by all corporate employees. ***The Congress is deeply concerned that the objectives sought by this series of laws will be made unattainable by regulations and rulings which treat employee stock ownership plans as conventional retirement plans, which reduce the freedom of the employee trusts and employers to take the necessary steps to implement the plans, and which otherwise block the establishment and success of these plans.***

Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h), 90 Stat. 1520 (1976) (emphasis added);

*Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 416 (2014) (describing Congressional

interest in encouraging the use of ESOPs and quoting the Tax Reform Act of 1976); *Grindstaff v.*

*Green*, 133 F.3d 416, 422 (6th Cir. 1998) ("Congress has repeatedly expressed its intent to

encourage the formation of ESOPs by passing legislation granting such plans favorable

treatment, and has warned against judicial and administrative action that would thwart that

goal.") (quoting *Donovan v. Cunningham*, 716 F.2d 1455, 1466 (5th Cir. 1983)).

Nearly all ESOP transactions are leveraged buyouts, meaning that the parties use the

company's assets to obtain the financing necessary to fund the ESOP's acquisition of the

company's stock. *See, e.g.*, NCEO Leveraged ESOPs and Employee Buyouts, pp. 5-9 (6th ed.

2017) ("*NCEO Leveraged ESOPs*"), a copy of which is attached as Ex. 47 to the Declaration of

Michael J. Prame ("Prame Decl.").  Leveraged ESOP transactions commonly involve two levels of loans.  *See id.*  pp. 5-6.

First, the company will obtain loans from financial institutions, private equity firms, or the selling shareholders themselves (the "external loans").  *Id.*  The proceeds of the external loan debt that the company takes on often is used by the company to buyout the existing shareholders through a combination of cash payments and promissory notes to be paid off over time.

Second, the company and the ESOP will enter into a purchase and sale agreement and also a promissory note (the "internal loan").  *Id.*  Under the purchase and sale agreement, the ESOP buys newly issued shares from the company and, under the promissory note, the ESOP agrees to pay the company for those shares over time.[2]

In connection with most leveraged ESOP transactions, the company takes out multiple external loans to finance the transaction.  The first layer of external loans is "senior debt" that the company borrows from banks and other financial institutions.  Senior debt is secured by collateral and enjoys the highest repayment priority, but the amount that can be borrowed as senior debt is generally capped at a multiple of the company's earnings.  *See* Brealey, Myers, and Allen, *Principles of Corporate Finance*, pp. 601-02 (10th ed. 2011), at Prame Decl. Ex. 48.  The

---

[2]   The company makes tax-deductible contributions to the ESOP, which the ESOP immediately returns to the company as installment payments on the internal loan.  NCEO Leveraged ESOPs, pp. 5-6, at Prame Decl. Ex.47; *see*, *Hugler v. First Bankers Tr. Servs., Inc.*, No. 12-CV-8649, 2017 WL 1194692, at *5 (S.D.N.Y. Mar. 30, 2017) (describing similar financing structure); *Reich v. Valley Nat. Bank of Arizona*, 837 F. Supp. 1259, 1273 (S.D.N.Y. 1993) (same, and noting that "the ESOP obtained its six million shares without any initial cash outlay").

priority and secured status of senior debt contributes to the lender bearing less risk and, as a result, a lower cost to the company of borrowing (*e.g.*, a single-digit interest rate).[3]  *Id.*

"Mezzanine financing" is used when the cap on the amount of senior debt available from banks falls short of the company's capital needs.  *See* Corry Silbernagel and Davis Vaitkunas, *Mezzanine Finance White Paper,* Bond Capital, p. 3 (2d ed. 2012), *available at* https://www.bondcapital.ca/wp-content/uploads/pdfs/2016-bond-capital-mezzanine-finance-white-paper.pdf ("Mezzanine Finance White Paper") at Prame Decl. Ex.49.  Mezzanine financing is behind senior debt in repayment priority and is often unsecured or partially-secured. *Id.*  Because mezzanine lenders assume more risk than senior lenders, mezzanine lenders demand higher rates of return than senior lenders.  *Id.* at 3-5.

There may be multiple sub-layers of mezzanine financing, with different layers bearing more risk and having different return features, including payment-in-kind ("PIK") interest, conversion rights, and debt accompanied with warrants.[4]  *Id.* at 3-4. The more junior and subordinated the mezzanine lender – those furthest down the repayment/priority ladder – the higher the rate of return the lender will require, meaning a higher cost of debt to the borrower. *Id.*; *see also* Starr Dep. 25:15-28:12 ("You get a rate of return based upon your risk[,] so a senior lender takes the least risk and gets the least return, mezzanine lender gets the next level of risk

---

[3] The "rate of return" to lenders and "cost of debt" to borrowers are two sides of the same coin. If the rate of return to the lender is a market rate of return, the cost of debt to the borrower is also said to be market rate.

[4] PIK interest is "a financial instrument that pays interest or dividends to investors of bonds, notes, or preferred stock with additional securities or equity instead of cash."  Investopedia, *Payment-in-Kind (PIK)*, *available at* https://www.investopedia.com/terms/p/paymentinkind.asp.

Convertible securities are "investment[s] that can be changed into another form," like convertible bonds or preferred stock that "can be changed into equity or common stock."  *Id.*, *Convertible Security*, *available at* https://www.investopedia.com/terms/c/convertible-security.asp.

and gets a much higher rate of return[,] and an equity holder in a capital structure takes the most risk and gets the highest rate of return.") at Prame Decl. Ex. 5.

**B.     The Use Of Warrants In Leveraged Transactions.**

A warrant is a security "firms issue to ***finance*** their operations" that gives the warrant holder the right, for a limited period of time, to buy shares of stock in the company at a pre-determined price (the "strike price").  Grinblatt & Titman, *Financial Markets and Corporate Strategy*, p. 79 (Irwin/McGraw-Hill 1998) (emphasis added) at Prame Decl. Ex. 50.  As one of the Department's experts, Dr. Anant Sundaram, admitted in his deposition that (i) borrowers commonly take on subordinated debt that has a lower-than-market interest component, but that is combined with warrants to achieve a market rate of return for the lender, and (ii) the below market interest rate is beneficial to the company because it relieves cash flow pressure that would exist if the required interest rate was higher:

> Q: So, what is it that you teach with respect to why you use the warrants . . . ?
>
> A: . . . [B]ecause, again, in that situation there's a straight debt piece and a warrant piece . . . . In the straight debt there is this below-market interest rate that the debt holder settled for and the warrant sort of offsets or compensates for so that ultimately they get their required market rate of return given market conditions, and warrants help with that. And that it relieves the cash flow pressure to equity holders in the initial stages of the LBO because otherwise they would be paying a higher-than -- higher interest rate than they actually do, so it's a way to -- yeah, way to increase the cash flow to equity in the initial stages relative to what the cash flows would have been had they -- if they had to pay the required coupon rate as the market would demand. It is purely straight debt.

Sundaram Dep. 66:2-21 at Prame Decl. Ex. 43.

In this regard, warrants issued in connection with subordinated debt are considered a form of deferred interest on the debt:

> ***Warrants are just a form of interest***. Warrants are just a -- rate enhancement to interest . . . allowing the buyer not to pay current cash . . . .  If the required return on that subordinated debt was 20 percent, would we be having the same conversation on subtract the 20 percent interest costs -- the present value of the 20

percent interest costs from the purchase price?  *Because that's all the warrant is. It's only developing a return on the sub debt.*

Nelson Dep. 70:9-19 at Prame Decl. Ex. 7 (emphasis added).

To summarize, warrants are directly tied to the debt issued by lenders at a below market interest rate.  In permitting the lenders to acquire stock in the company at a later date, the warrants serve to possibly bring the lenders' rate of return back up to a market rate of return.

In addition to the below market interest rate and reduced pressure on cash flow, warrants shift the risk of financial performance to the lenders:  if the company's financial performance is so positive in the future that the company's stock price exceeds the warrants' strike price, then the warrants are economically valuable to the lender.  But if the company does not perform as well as anticipated and the stock price never rises above the warrant's strike price, the company's effective cost of debt is only the below market interest rate, which would financially benefit the company as the borrower and the ESOP as a shareholder.[5]

## C.    The HCMC ESOP's Leveraged Buyout of HCMC.

Lynn Mestel founded two companies in the legal staffing industry, HC2, Inc. (d/b/a/ Hire Counsel) ("Hire Counsel") and The WOB Company, Inc. (d/b/a Mestel & Company) ("Mestel & Co.").  Wilmington Trust's Statement of Material Facts not in Dispute ("SOMF"), ¶ 1.  Mestel and her daughter, Willa Fawer (collectively, the "Sellers"), owned 100% of Hire Counsel's outstanding common stock, with Mestel owning 91% and Fawer owning 9%.  SOMF ¶ 2. Mestel also owned 100% of Mestel & Co.'s outstanding common stock.  *Id.*

---

[5]   Eight years have passed since the Transaction and the share price of the HCMC stock has not exceeded the strike price on the warrants.  Starr Dep. 189:24-190:4 ("Q: Has Long Point Capital exercised any of its warrants with respect to HCMC? A: No, they are worthless at this point.") at Prame Decl. Ex. 5.  The Department, nonetheless, is seeking damages of $14 million associated with warrants that have never been exercised and remain worthless to the lenders.

When Mestel and Fawer decided to sell the companies to their employees through an ESOP transaction, Hire Counsel's and Mestel & Co.'s ownership first was reorganized such that the previously two independent corporate entities became subsidiaries of a new corporate entity, HCMC. *Id.* ¶¶ 10-11. The HCMC ESOP did not purchase stock in HCMC directly from Mestel and Fawer; rather, Mestel and Fawer were bought out by the company and the HCMC ESOP purchased newly-issued shares from HCMC. *Id.* ¶ 14.

The buyout of Mestel and Fawer was financed by (i) senior debt and mezzanine debt from Fifth Third, and (ii) subordinated mezzanine financing from Long Point Capital ("Long Point"), Mestel, Fawer, and certain members of HCMC's management. *Id.* ¶¶ 16-18. In all, HCMC accomplished the buyout using the following external loans:

- Senior debt from Fifth Third, in the form of an $11 million term-loan bearing interest equal to LIBOR plus 4.0% ("Senior Debt"), *id.* ¶ 19(a)-(b);

- Mezzanine debt from Fifth Third totaling $8.333 million, which carried an interest rate of 16% (consisting of straight interest of 12.5% and PIK interest of 3.5%) and a 3% commitment fee, which was subordinate to the Senior Debt ("Fifth Third Mezzanine Debt"), *id.* ¶ 19(c)-(d);

- Mezzanine debt from the Sellers in the form of a note totaling $7.33 million, payment of which was contingent on the company's future financial performance, *id.* ¶ 19(e)-(f).

- Mezzanine debt from Long Point in the form of a note totaling $10 million that was subordinate to the Firth Third debt, which carried a 15% interest rate (7.2% payable in cash and 7.8% payable in PIK interest) and included 21,739,340 warrants with a strike price of $0.50 and an exercise window of 15 years, ("Long Point Subordinated Debt"); *id.* ¶ 19(g)-(h); and

- Mezzanine debt from HCMC management's team in the form of notes totaling $10.330 million that were subordinate to the Firth Third debt, which carried which carried a 15% interest rate (7.2% payable in cash and 7.8% payable in PIK interest) and 22,456,738 total warrants with a strike

price of $0.50 and an exercise window of 15 years ("Seller Subordinated Debt"), *id.* ¶ 19(i)-(j).[6]

The HCMC ESOP acquired ownership of the common stock by entering into a promissory note for $46 million. *Id.* ¶ 15.  The $46 million purchase price was approved by Wilmington Trust, as trustee of the ESOP, based on the valuation of the stock that was prepared by Chartwell. *Id.* ¶¶ 12-13.  Chartwell had determined that the range of fair market value for HCMC's stock was between $41 million to $50 million. *Id.* ¶ 12.

The Department maintains that Chartwell's valuation is flawed because it purportedly failed to "ascribe *any* value to the warrants in determining the fair market value of the ESOP's purchase" and that the warrants should have "reduced the price that the ESOP was willing to pay accordingly."  Compl. at ¶ 44.  There is no material dispute, however, that the warrants were a component of the acquisition debt in the Transaction.  *See infra* Part III.A.  For example, as the Subordinated Note and Warrant Purchase Agreement described:

> The Company is seeking funding to effect the closing of the Mergers (as defined below) and for general corporate and working capital purposes.  Accordingly, . . . the Company desires to issue and sell to the Purchasers, and the Purchasers desire to purchase in the aggregate from the Company, (i) subordinated notes . . . and (ii) warrants to purchase [HCMC common stock] . . . .

Long Point Subordinated Note and Warrant Purchase Agreement at WT00029682, Recital A, at Prame Decl. Ex. 40.

Other contemporaneous documents likewise described the notes and warrants as components of the Subordinated Debt.  *See* SOMF ¶ 21(a)-(h) (citing Agreement & Plan of Merger §§ 1.2(c), 1.7(b)(iv), 9.1 Definition of Management Amount at Prame Decl. Ex. 11;

---

[6] We refer to the lowest layers of mezzanine financing as the "Subordinated Debt," and to the parties who issued that debt (Long Point, Mestel, Fawer, and the members of company management) as the "Subordinated Lenders."

Long Point Capital Financing Memorandum at DOL-Daroth-0011836, 11838 at Prame Decl. Ex. 39; Chartwell Capital Solutions, HCMC Legal Inc. Valuation of Equity at WT00032550 at Prame Decl. Ex. 13; Long Point Subordinated Warrant and Purchase Agreement at Prame Decl. Ex. 40; Chartwell Transaction Fairness Opinion Letter at WT00028473 at Prame Decl. Ex. 12; Chartwell Presentation, "HC2-WOB Transaction – Preliminary Returns Analysis – Base Case," at WTHCMC_0025544-546 at Prame Decl. Ex. 38; Long Point Draft Preliminary Term Sheet at WT00032936 at Prame Decl. Ex. 41).

Numerous fact witnesses likewise testified that HCMC issued the warrants as a component of the Subordinated Debt.  Rothschild Dep. 120:16-121:10 (describing the transaction financing as "a structure *which attached a certain number of warrants to the subordinated notes* based on the amount of capital that they were investing and then . . . the former shareholders get an equal amount of notes and an equal number of warrants attached to their notes") at Prame Decl. Ex. 2 (emphasis added); Nelson Dep. 49:21-22 ("Warrants are a financing instrument used to provide return to debt capital."), 52:3-54:10 ("It's my understanding that there's a market rate of return that's required if there's a subordinated debt, and the number of warrants in addition to the interest and pick [sic] got them to that market rate of return."); 69:12-70:5 ("The warrants were a form of financing. But for the financing, the warrants would not be there. They did not affect the purchase price of the transaction.") at Prame Decl. Ex. 7; Golden Dep. 321:22-322:1 (the warrants were a "part of the financing of this transaction overall") at Prame Decl. Ex. 9; Matz Dep. 93:21-94:15 ("[T]he warrants were being used as a financing tool for the seller debt and the financier's debt," and the "sellers were providing . . . a note. . . . [and] they were getting warrants. So, . . . the warrants were part of the financing, it was the note and the warrants.  It was all in.") at Prame Decl. Ex. 42.

The Department's expert, Dr. Sundaram, also admitted that the warrants were a component of the acquisition financing for the Transaction.  Sundaram Dep. 78:7-10 ("Q: And the buyer in this case used warrants as part of the financing for purposes of acquiring that stock, correct? A: Yes."); *see also id.* at 92:23-25 (stating that he "consider[ed] the warrants to be part of the financing mix"); *id.* at 93:3-6 (stating that "the warrants were issued to parties who had issued notes in connection with the ESOP transaction") at Prame Decl. Ex. 43.

## III.   ARGUMENT

As highlighted above, there are three independent reasons why the Department cannot maintain claims based on a theory that the warrants reduced the fair market value of the stock that the HCMC ESOP acquired.  First, the Department's theory is directly contrary to the controlling legal standard that requires that fair market value be determined using a "hypothetical willing buyer/willing seller" standard that does not take into consideration how a particular buyer finances a stock purchase transaction.  Second, the Department's theory is directly contrary to the position the Department adopted in 1990 and to Congressional intent that the Department refrain from taking action that could hinder the establishment and success of ESOPs.  Third, the Department's experts admitted that below market interest rates create equity value that offsets the reduction in equity value that may be attributable to warrants.  The Department and its experts did not analyze the below market interest rate on the Subordinated Debt with respect to which the warrants were issued and, therefore, cannot dispute Wilmington Trust's evidence that the value created by the below market interest rate offset the purported loss of value associated with the warrants.

### A.   The Department's Theory Is Contrary To The Controlling Legal Standard.

Under ERISA, an ESOP can acquire stock in the company so long as it does not pay more than "adequate consideration."  *See* 29 U.S.C. §§ 1106, 1108(e); *Henry v. Champlain*

*Enterprises, Inc.*, 445 F.3d 610, 618 (2d Cir. 2006) ("Congress enacted in Section 408 a conditional exemption from the prohibited transaction rules for acquisition of employer securities by ESOPs.") (quoting *Donovan*, 716 F.2d at 1465).   ERISA defines "adequate consideration" as "the fair market value of the asset as determined in good faith by the trustee . . . and in accordance with regulations promulgated by the Secretary."[7] 29 U.S.C. § 1002(18)(B). The Department and Wilmington Trust agree that, for purposes of the adequate consideration analysis, "fair market value" is defined as:

> the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for that asset.

*Henry*, 445 F.3d at 619.

It is well-established that the "willing buyer" and "willing seller" are "hypothetical persons rather than specific individuals or entities, and their characteristics are not necessarily shared by the actual seller or particular buyer."  *Perez v. Bruister*, 54 F. Supp. 3d 629, 675 (S.D. Miss. 2014); *see, e.g.*, *Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007, 1048 (W.D. Wisc. 2012) (describing hypothetical standard); *Hans v. Tharaldson*, No. 3:05-cv-115, 2011 WL 6937598, at *4 (D.N.D. Dec. 23, 2011) (describing the hypothetical standard as "legally mandated"); *Eyler v. Comm'r*, 69 T.C.M. (CCH) 2200 (T.C. 1995) (the standard is "objective, using a purely hypothetical willing buyer and seller"), *aff'd* 88 F.3d 445 (7th Cir. 1996); Pratt,

---

[7]  In 1988, the Department proposed regulations to further define adequate consideration, as it "recognize[d] that plan fiduciaries have a need for guidance in valuing assets, and that standards to guide fiduciaries in this area may be particularly elusive with respect to [privately held securities]."  Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17,632, 17,633 (May 17, 1988).  Despite recognizing the need for guidance, the Department never finalized the regulations or otherwise issued guidance regarding the meaning of adequate consideration.  It instead has sought to regulate by after-the-fact enforcement.

*Valuing a Business*, p. 42 (5th ed. 2008) ("[T]he willing buyer and willing seller are hypothetical

persons. . . rather than any particular buyer or seller. . . . [A] price would not be considered

representative of fair market value if influenced by special motivations not characteristic of a

typical buyer or seller.") at Prame Decl. Ex. 51.[8]

Under the objective standard involving hypothetical actors, attributes associated with the

particular parties involved in the transaction are not considered when determining fair market

value.  For example, when an ESOP purchases a 100% interest in a corporation that qualifies for

S-Corp status under the Internal Revenue Code, the company's earnings after the acquisition by

the ESOP are effectively free from federal income taxes because (i) no tax is paid at the

corporate level, and (ii) earning passed through to the ESOP are not taxed because the ESOP is

tax-exempt.  The courts have held that ESOP trustees, like Wilmington Trust, should ignore this

ESOP-specific attribute when assessing the company's future cash flows and determining the

company's fair market value because that tax-exempt structure is a characteristic of the particular

buyer, not a hypothetical buyer.  *See Chesemore*, 886 F. Supp. 2d at 1048 ("The tax shield

represented a special advantage for an ESOP purchaser and, for that reason, was inappropriate to

consider when valuing Trachte's fair market value between a hypothetical willing buyer and

seller on the open market.").

---

[8] The fair market value standard's focus on a hypothetical buyer/seller is in contrast to other standards of value, like "investment value," which do take into account specific characteristics unique to the buyer and seller.  *See* Pratt, *Valuing a Business*, pp. 41-43 (distinguishing between the standards) at Prame Decl. Ex. 51.  Indeed, this Court has held that ESOP trustees valuing privately held stock must not to apply a standard that focuses on the specific characteristics of the ESOP as a buyer.  *Valley Nat'l Bank of Az.*, 837 F. Supp. at 1283 (finding trustee liable because it "did not refer in its analysis to what a hypothetical, non-coerced buyer would pay, but rather analyzed the investment in terms of the same conditions paid by the ESOP . . . . The result was the investment value of the shares to the ESOP, not the fair market value, as Valley was required to pay under [29 U.S.C. § 1002(18)(B)].")); *id.* at 1282 ("Investment value to the ESOP is not the same as fair market value, and it is the latter which is required by ERISA § 3(18).").

Like the tax-shield, how a particular buyer finances a transaction – using cash, debt/warrants, or a combination thereof – is an attribute specific to that buyer that should not factor into the hypothetical willing buyer/willing seller analysis.  A lawsuit that the Department filed (and withdrew) in 1990 and subsequent case law clearly establishes this point.

In 1990, the Department filed the lawsuit styled *Dole v. Farnum*, alleging that fair market value in connection with an ESOP transaction should be determined by evaluating the company's projected future cash flows as impacted by its repayment of the acquisition debt. *Dole v. Farnum*, No. 90-0371 (D.R.I. filed July 30, 1990); *see* News Release: Labor Department Sues Fiduciaries and Rhode Island Company Directors for Improper Use of Plan Assets, Pension and Welfare Benefits Administration, Office of Information, U.S. Department of Labor, USDL 90-434 (D.O.L.), 1990 WL 307811 (Aug. 17, 1990) ("The complaint alleges that the fiduciaries violated ERISA when they allowed the plan to purchase stock at a price which exceeded fair market value and ***because the plan fiduciaries failed to take into account the cash drain on [the company] caused by the ESOP financing***.") (emphasis added).

The Department withdrew the *Farnum* lawsuit shortly after it was filed.  Congressional leadership at the time correctly pointed out the Department's misstep:

> The basic flaw in the DOL's position, which might have called into question the legality of nearly all leveraged ESOP's, is that ***the complaint confuses valuation with financing.  The price, or market value, is what a willing buyer will pay to a willing seller, and it does not matter whether the buyer uses cash on hand, or debt***. . . . Since the leveraged ESOP is the most logical way for employees, generally without adequate funds to pay for stock out of their pockets, and without the credit to borrow money, it is unreasonable to maintain that leveraged ESOP's are legal only if some seller is willing to sell to employees at less than fair market value.

Sen. Byrd, 136 Cong. Rec. S17793-01 (1990) (emphasis added).

Post-*Farnum*, the courts similarly have concluded that a particular buyer's acquisition debt is not to be considered when determining fair market value under the hypothetical willing

buyer/willing seller standard.  For example, the plaintiff in *Scott v. Evins*, 802 F. Supp. 411 (N.D. Ala. 1992), *aff'd*, 998 F.2d 1022 (11th Cir. 1993), alleged that the appraiser erroneously applied the hypothetical willing buyer/willing seller standard when it failed to deduct the value of the acquisition debt from the company's future cash flows.  *Id.* at 412-13, 415-16.  The court upheld the appraiser's analysis and ruled that acquisition debt should not be considered under the hypothetical willing buyer/willing seller standard:

> The [Department's] proposed regulations do not state that the valuation must take into account any additional debt placed on the issuer as a result of the transaction. ***The common stock of [the company] exists independently of the debt used to leverage the purchase***, whether or not guaranteed by the corporation (as was done here). When the stock was appraised, no such debt existed and was therefore properly not taken into account.

*Id.* at 415-16 (emphasis added); *see also id.* at 412, fn.6 ("[P]laintiffs contend omission of the contemplated leverage transaction was error . . . . The court does not agree with this contention."); *accord Estate of Blount v. C.I.R.*, 87 T.C.M. (CCH) 1303 (2004) (applying hypothetical standard and holding that "[t]o treat the corporation's actual obligation to redeem the very shares that are being valued as a liability that reduces the value of the corporate entity thus distorts the nature of the ownership interest represented by those shares").

Consistent with the holding in *Evins*, this Court, in *Reich v. Valley National Bank of Arizona*, concluded that the fair market value of stock for an ESOP transaction is determined independent of how the ESOP intends to finance the transaction.  This Court held that the fair market value standard requires that the trustee evaluate a company's value "from the point of view of a willing cash or cash-equivalent investor."  837 F. Supp. at 1282; *see also* Pratt, *Business Valuation Discounts and Premiums*, p. 10 (2nd ed. 2009) (fair market value "is assumed to be a cash value") at Prame Decl. Ex. 52.

The Department's allegations in this case that warrants issued to the Subordinated Lenders must be considered in determining fair market value of HCMC stock are directly contrary to the controlling hypothetical willing buyer/willing seller standard and the case law discussed above.  Like the Department's claim in *Farnum*, the Department's warrants theory incorrectly and inappropriately "confuses valuation with financing."  Sen. Byrd, 136 Cong. Rec. S17793-01.  As a component of the Transaction's financing, the warrants and other financing terms are attributes of a particular buyer that are properly excluded from the analysis when determining fair market value under the hypothetical willing buyer/willing seller standard. Contrary to the Department's claims*,* the hypothetical willing buyer/willing seller standard is based on the viewpoint of a cash investor, as this Court concluded in *Valley National Bank*.  The terms of the acquisition debt, including the warrants, are therefore not to be considered in determining fair market value.   *See also Scott*, 802 F. Supp. at 416 ("The common stock of [the company] exists independently of the debt used to leverage the purchase" and, the debt "was therefore properly not taken into account" in determining fair market value).

Accordingly, the Department cannot maintain claims based on a theory that the warrants should have reduced the fair market value of HCMC's stock.

**B.**     **The Department's Theory Is Contrary To Its Own Guidance And Congressional Intent.**

Concurrent with the withdrawal of the *Farnum* lawsuit in 1990, the Department unequivocally advised that (i) "[t]he department will not consider obligations and liabilities arising in connection with the ESOP's acquisition debt," and (ii) the Department "will not consider the obligations assumed by the company in connection with the ESOP in determining whether the plan paid more than adequate consideration for employer securities."  Pensions &

Investments, "Withdrawal of suit hurts Labor Department," p. 31 (Oct. 29, 1990) at Prame Decl.

Ex. 53; BNA Pension Reporter, Vol. 17, No. 49, p. 2008 (Dec. 3, 1990) at Prame Decl. Ex. 54.

The warrants are "obligations and liabilities arising in connection with the ESOP's

acquisition debt" that, in 1990, the Department expressly advised would not be considered in

determining whether the ESOP paid more than fair market value/adequate consideration.  The

position that the Department advances in this lawsuit is directly contrary to its 1990 guidance,

which the Department has never retracted or altered through regulation, sub-regulatory guidance,

or informal guidance in the last three decades.

Moreover, the Department's position runs contrary to Congress's stated intent, as quoted

by the Supreme Court in *Dudenhoeffer*, that the Department (and the courts) refrain from making

"regulations and rulings . . . which otherwise block the establishment and success of [ESOPs]."

*Dudenhoeffer*, 573 U.S. at 416 (quoting Tax Reform Act of 1976, Pub. L. No. 94-455, § 803(h)).

As discussed above and as is common in leveraged buyouts generally (not just those undertaken

by ESOPs), warrants are a component of mezzanine financing used by those lenders that are

deeply subordinate in the capital structure, but are the lenders that provide the borrowing

capacity essential to bridge the gap in the leveraged buyout transaction between the amount that

senior lenders are willing to lend and the purchase price.  *See supra* Part II.B.  Concluding that,

for ESOP transactions, warrants negatively impact the fair market value of the stock being

acquired will mean that deeply subordinated lenders who require warrants to achieve a market

rate of return will effectively be precluded from participating in the financing of ESOP

transactions.   As such, the Department's position, if adopted by the Court, would hinder the

formation of new ESOPs contrary to Congressional intent by preventing companies and ESOPs

from accessing sources of capital that are commonly needed to undertake and complete leveraged buyout transactions.

The Court, therefore, should grant summary judgment to Wilmington Trust on the Department's claims related to warrants because the Department's theory is directly contrary to the position it adopted in 1990 and the statement of Congressional intent quoted above and in the Supreme Court's opinion in *Dudenhoeffer*.

## C.     The Department's Experts Admitted That Below Market Interest Rates And Warrants Can Offset Each Other.

Even if the Court finds that warrants issued to obtain transaction financing should be considered in analyzing fair market value under the controlling legal standard, Wilmington Trust is still entitled to summary judgment.  The Department's expert in support of its theory with respect to warrants, Dana Messina,[9] acknowledged that debt with a below market interest rate would "create equity value" that can offset any purported "decrease in equity value" associated with the issuance of warrants:

> Q: Okay.  And why don't you take into account the -- the interest -- . . . rate in the ESOP context?
>
> A: If the interest rate is at market, it should not affect the equity value of the company.

---

[9]  Mr. Messina lacks the basic professional credentials held by professionals in the valuation industry.  He is not credentialed by the American Society of Appraisers, the largest professional organization that teaches, tests, and credentials highly qualified appraisers of businesses, real estate, and other property.  Nor did Mr. Messina undertake the studies and tests necessary to be certified by the CFA Institute as a Chartered Financial Analyst.  *See* Messina Dep. 30:5-13 at Prame Decl. Ex. 44.

Mr. Messina's work for the Department also has been results driven.  Mr. Messina testified that he has reviewed hundreds of ESOP valuations for the Department since the mid-2000s and that more than 80% of time he reaches the conclusion that the valuation – many of which were prepared by the largest, most reputable experts in the field – is flawed.  *See* Messina Dep. 363:16-369:20 at Prame Decl. Ex. 44.

Q: And if the interest rate is below market?

A: . . . [T]o the extent that you're able to borrow money at an advantageous rate, that creates equity value.

. . .

Q: Is there any situation when . . . it would be appropriate not to value the warrants at the time of the transaction and deduct that value from enterprise value?

A: . . . You could come up with a hypothetical scenario where there are other attributes, for instance, below-market debt or favorable terms in an agreement, that might offset the reduction that's created by warrants. . . .

Messina Dep. 109:16-116:23 at Prame Decl. Ex. 44; *see also* Sundaram Dep. 164-66 (discussing that a below market interest rate – "debt at 5 percent in a 10 percent world" – creates an "above-market value of equity") at Prame Decl. Ex. 43.

Wilmington Trust, through Chartwell, confirmed at the time of the Transaction that the interest rate on the Subordinated Debt was below market.  The Subordinated Debt with respect to which warrants were issued was more junior and subordinate to other lenders, but the interest rate on their loans ***was lower than*** that of the more senior lenders.  Chartwell confirmed that the issuance of the warrants offset the below market interest rate so as to only provide a market rate of return to the Subordinated Lenders:

Q: Okay. The warrants were used to provide -- my understanding is the warrants were used to provide a certain return for certain subordinate lenders. Is that fair?

A: Correct.

Q: How was it determined what return was necessary for the subordinate lenders?

A: . . . There's market data that would tell you what senior debt market returns are, what mezzanine market returns are, what junior debt market returns are, and what equity market returns are. And so through that analysis, you can get to here's what -- here's where the subordinated debt sits in the capital structure of HCMC. It's below the mezzanine financing. Mezzanine financing is getting 16 percent plus a 3 percent origination fee. So that's how you do that analysis.

. . .

Q: Did Chartwell perform calculations based on the market data?

A: We would have reviewed that data, yes. . . . To determine what is an appropriate rate for this instrument, we're going to look at what are the other forms of capital in the business, right, so that's one way to kind of look at it. And then we're going to look at is there market data that says what a similar instrument might require in terms of return. And through that analysis, we say is this reasonable for the returns in this case.

Q: Where did the market data come from? Is that provided by anybody or on a database --

. . .

A: Chartwell has a corporate finance team in Chicago that places debt, and especially junior and subordinated debt. That would have been a source of our information.

Q: Okay. Did Chartwell consult with the capital finance team in Chicago in reaching any determination regarding the market rate of debt?

A: We did.

Nelson Dep. 78:24-81:3 at Prame Decl. Ex. 7.

Wilmington Trust's corporate finance expert, Robert Grien, also analyzed whether, factoring in the warrants, the rate of return on the Subordinated Debt was market.   Based on his "30 years of experience in finance, more than 25 of which relate to financing leveraged transactions including leveraged buyouts," Rebuttal Expert Report of Robert Grien ("Grien Report") ¶ 1 at Prame Decl. Ex. 45, *see also id.* ¶¶ 1-8, Appendix A, Grien concluded that the rate of return on the Subordinated Debt was "consistent with market rates" for other leveraged buyouts at the time of the Transaction, *id.* at ¶ 12, first bullet.  Grien based his opinion not only on his extensive personal experience in leveraged buyouts during this time period, but also on his review of the rate of return on the Fifth Third Mezzanine Debt that was senior to the Subordinated Debt but had a higher interest rate, his own market research, industry studies and academic and industry publications.  Id. at ¶¶ 12, 20-23.

21

The Department's expert, Mr. Messina, testified that, "[i]f the interest rate is at market, it should not affect the equity value of the company."  Messina Dep. 109:20-22 at Prame Decl. Ex. 44.  The Department and its experts did not analyze the below market interest rate on the debt with respect to which the warrants were issued and, as such, cannot dispute Wilmington Trust's evidence that the value created by the below market interest rate on the Subordinated Debt offset the purported reduction in value associated with the warrants, so as to result in the lender only receiving a market rate of interest.   Sundaram Dep. 172:13-20 ("Q: Have you done any analysis or offering any opinion with respect to whether the particular warrants here were of the type that you described in your example that you gave that would bring the returns on the notes up to a market value of returns? . . . A: No.") at Prame Decl. Ex. 43; Messina Dep. 150:21-25 ("Q: And you did not conduct such analysis in this case as to what were the market rates for debt investors correct? A: . . . I'm not giving an opinion as to what the market rate of debt is.") at Prame Decl. Ex. 44.  Because the undisputed evidence establishes that the Subordinated Lenders received only a market rate of return even if the warrants were exercised, the rate of return does not "affect the equity value of the company." Messina Dep. 109:20-22 at Prame Decl. Ex. 44.  Accordingly, the Court should conclude that HCMC's equity value should not have been reduced, as the Department claims, due to the issuance of the warrants.

## IV.   CONCLUSION

Under the objective hypothetical willing buyer/willing seller standard, which the Department and courts have long-endorsed, the manner in which a particular buyer finances an acquisition has no bearing on the fair market value of the acquired stock.  Wilmington Trust respectfully requests that the Court grant partial summary judgment in its favor on the Department's First and Second Claims for Relief to the extent they are premised on allegations relating to the warrants issued to the Subordinated Lenders in the Transaction.

22

Dated: June 21, 2019                    Respectfully submitted,

                                        */s/ Michael J. Prame*
                                        Michael J. Prame
                                        Mark C. Nielsen
                                        Andrew Salek-Raham
                                        Groom Law Group, Chartered
                                        1701 Pennsylvania Avenue, NW
                                        Washington, DC 20006
                                        Telephone: (202) 861-0620
                                        Facsimile: (202) 659-4503
                                        Email: mprame@groom.com
                                                mnielsen@groom.com
                                                asalek-raham@groom.com